Trenton R. Kashima (SBN 291405)
**BRYSON HARRIS SUCIU**
**& DeMAY PLLC**
19800 MacArthur Blvd., Suite 270
Irvine, CA 92612
Telephone: (212) 946-9389
tkashima@brysonpllc.com

*Attorney for Plaintiffs*

*(Additional Counsel listed on Signature Page)*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LOUISE RAMOS and KEVIN COYNE, individually and on behalf of all others similarly situated,<br><br>                Plaintiffs,<br><br>        v.<br><br>CALIFORNIA CASUALTY INDEMNITY EXCHANGE,<br><br>                Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br><br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs Louise Ramos and Kevin Coyne (collectively referred to as "Plaintiffs"), and on behalf of all others similarly situated, and on behalf of the general public, upon personal knowledge of facts pertaining to them and upon information and belief as to all other matters, and by and through undersigned counsel, hereby bring this Class Action Complaint against California Casualty Indemnity Exchange ("California Casualty" or "Defendant"), and allege as follows:

## <u>NATURE OF THE ACTION</u>

1.      Plaintiffs bring this action on behalf of themselves and all other individuals similarly situated ("Class Members") against California Casualty for its failure to secure and safeguard the personally identifiable information ("PII") of Plaintiffs and Class Members.

2.      California Casualty is an insurance company headquartered in San Mateo, California, that issues and administers insurance policies to consumers throughout California, Arizona, Colorado, Idaho, Kansas, Oregon, and Wyoming.

3.      In the regular course of its business, California Casualty is required to maintain reasonable and adequate security measures to protect its customers' PII against unauthorized access and disclosure.

4.      Between September 2, 2025, and September 8, 2025, an unauthorized third party gained access to California Casualty's network and accessed and obtained files containing PII of California Casualty's customers (the "Data Breach").

5.      California Casualty owed a duty to Plaintiffs and Class Members to implement and maintain reasonable and adequate security measures to secure, protect, and safeguard their PII against unauthorized access and disclosure. California Casualty breached that duty by, among other things, failing to, or contracting with companies that failed to, implement and maintain reasonable security procedures and practices to protect customers' PII from unauthorized access and disclosure. Every year, millions of Americans have their most valuable PII stolen and sold online because of data breaches. Despite dire warnings about the severe impact of data breaches on Americans across all economic strata, companies still fail to make the necessary investments in implementing important and adequate security measures to protect their customers' data.

6.      California Casualty required its customers to provide it with sensitive PII and failed

CLASS ACTION COMPLAINT

to protect it. California Casualty had an obligation to secure customers' PII by implementing reasonable and appropriate data security safeguards. This was part of the bargain between California Casualty and Plaintiffs and Class Members.

7.    As a result of California Casualty's failure to provide reasonable and adequate data security, Plaintiffs' and the Class Members' unencrypted, non-redacted PII has been exposed to unauthorized third parties. Plaintiffs and the Class are now at much higher risk of identity theft and cybercrimes of all kinds, especially considering the highly sensitive PII stolen here and the fact that the compromised PII is likely already being sold on the dark web. This risk constitutes a concrete injury to Plaintiffs and the Class, as they no longer have control over their PII, which is now in the hands of third-party cybercriminals. This substantial and imminent risk of identity theft has been recognized by numerous courts as a concrete injury sufficient to establish standing.

8.    Plaintiffs and the Class will have to incur costs to pay a third-party credit and identity theft monitoring service for the rest of their lives as a direct result of the Data Breach.

9.    Plaintiffs bring this action on behalf of himself and those similarly situated to seek redress for the lifetime of harm they will now face, including, but not limited to, reimbursement of losses associated with identity theft and fraud, out-of-pocket costs incurred to mitigate the risk of future harm, compensation for time and effort spent responding to the Data Breach, the costs of extending credit monitoring services and identity theft insurance, and injunctive relief requiring California Casualty to ensure that it implements and maintains reasonable data security practices going forward.

## **THE PARTIES**

10.    Plaintiff Louise Ramos (individually, "Plaintiff Ramos") is a resident of the State of California, whose personal information was compromised in the Data Breach. Plaintiff Ramos was a resident of California at the time of the Data Breach.

11.    Plaintiff Kevin Coyne is a resident of the State of Washington, who was insured by California Casualty in California through 2014 and subsequently insured under California Casualty of Oregon while residing in Washington State. Plaintiff Coyne's personal information was compromised in the Data Breach.

CLASS ACTION COMPLAINT

12.     Defendant California Casualty is an insurance company headquartered in San Mateo, California, and with a principal place of business located at 1875 S. Grant Street San Mateo, CA 94402.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one member of the class is a citizen of a state different from Defendant. Specifically, Plaintiff Kevin Coyne is a citizen of Washington.

14.     For purposes of the Class Action Fairness Act, Defendant California Casualty is deemed to be a citizen of both the state in which it has its principal place of business and the state under whose laws it is organized, pursuant to 28 U.S.C. § 1332(d)(10). California Casualty is organized under the laws of California and maintains its principal place of business in San Mateo, California.

15.     This Court has personal jurisdiction over Defendant because it maintains its principal place of business in California and transacts business in California.

16.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because two of the defendants have their principal place of business in this District, all three defendants transact business in this District, and a substantial part of the events, acts, and omissions giving rise to Plaintiffs' and Class Members' claims occurred in this District.

## FACTUAL ALLEGATIONS

17.     This is a class action brought by Plaintiffs, individually and on behalf of all citizens who are similarly situated (i.e., the Class Members), seeking to redress California Casualty's willful and reckless violations of his privacy rights. Plaintiffs and the other Class Members were customers who contracted with California Casualty.

18.     This action pertains to California Casualty's unauthorized disclosures of the Plaintiff's PII that occurred during the Data Breach. Between September 2, 2025, and September 8, 2025, an unauthorized third party accessed and obtained Plaintiffs' and the Class Members' PII.

CLASS ACTION COMPLAINT

19.     On November 19, 2025, California Casualty allegedly began disclosing to Plaintiffs and the other Class Members that their PII was exposed to unauthorized persons as a direct and/or proximate result of California Casualty's failure to safeguard and protect their PII.

20.     By obtaining, collecting, and storing the PII of Plaintiffs and Class Members, California Casualty assumed legal and equitable duties and knew or should have known it was responsible for protecting the PII from unauthorized disclosures.

21.     Despite recognizing its duty to do so, California Casualty failed to implement security safeguards to protect Plaintiffs' and the Class Members' PII.

22.     Plaintiffs and Class Members have taken reasonable steps to maintain the confidentiality of their PII and relied on California Casualty to keep their PII confidential and maintained securely, to use this information for business purposes only, to make only authorized disclosures of this information, and to ensure that its third-party vendors take similar steps.

**A.     The Data Breach**

23.     Upon information and belief, according to a data breach notification ("Breach Notice") issued by California Casualty and sent to affected individuals on or around November 19, 2025, unauthorized access to its network systems occurred between September 2 and September 8, 2025. During this period, an unauthorized third party accessed and copied files on the California Casualty network that contained PII, including full names, Social Security numbers, driver's license or state ID numbers, dates of birth, tax identification numbers, and financial account numbers.

24.     The Breach Notice, upon information and belief, did not specify detailed measures or actions taken by California Casualty to fully remediate the vulnerabilities that led to the Data Breach, nor did it explain specific measures adopted to prevent future incidents.

**B.     The Data Breach was Preventable**

25.     Had California Casualty maintained industry-standard safeguards to monitor, assess, and update security controls and related system risks, California Casualty could have safeguarded customer and customer data. California Casualty's lack of security controls and the delayed implementation of enhanced security measures only after the Data Breach are inexcusable.

CLASS ACTION COMPLAINT

26.    California Casualty was at all times fully aware of its obligation to protect customers' PII and the risks associated with failing to do so. California Casualty knew that information of the type collected, maintained, and stored by California Casualty is highly coveted and a frequent target of hackers.

27.    This exposure, along with the fact that the compromised PII is already likely being sold on the dark web, is tremendously problematic. Cybercrime is rising at an alarming rate, as shown in the FBI's Internet Crime Complaint statistics chart shown below:



28.    By 2013, it was being reported that nearly one out of four data breach notification recipients become a victim of identity fraud.[1]

29.    Stolen PII is often trafficked on the dark web, as is the case here. Law enforcement has difficulty policing the dark web due to this encryption, which allows users and criminals to conceal identities and online activity.

30.    When malicious actors infiltrate companies and copy and exfiltrate the PII that those companies store, that stolen information often ends up on the dark web because the malicious actors buy and sell that information for profit.[2]

---

[1] Al Pascual, *2013 Identity Fraud Report: Data Breaches Becoming a Treasure Trove for Fraudsters*, JAVELIN (Feb. 20, 2013), https://javelinstrategy.com/research/2013-identity-fraud-report-data-breaches-becoming-treasure-trove-fraudsters (last visited June 20, 2025).

[2] *Shining a Light on the Dark Web with Identity Monitoring*, IDENTITYFORCE (Feb. 1, 2020), https://www.identityforce.com/blog/shining-light-dark-web-identity-monitoring.

CLASS ACTION COMPLAINT

31.     In April 2023, NationsBenefits, "disclosed that thousands of its members had their personal information compromised in a late-January ransomware attack targeting Fortra's Anywhere platform, a file-transfer software that the firm was using. According to the news reports, the ransomeware gang CLOP claimed responsibility for the attack, saying it took advantage of a previously known vulnerability."[3]

32.     In mid-April 2023, "the second largest health insurer [Point32Health], in Massachusetts, suffered major technical outages resulting from a ransomware attack. The incident brought down the company's systems that it uses to service members and providers, resulting in some members having difficulty contacting their insurers."[4]

33.     In May 2023, MCNA Insurance Company disclosed that "personal health information of nearly nine million customers was compromised in a cyber incident discovered in March. In a data breach notification letter filed with the Maine state attorney general's office dated May 26, the firm said that it detected unauthorized access to its systems on March 6, with some found to be infected with malicious code…According to MCNA, the hackers were successful in accessing customer personal information."[5]

34.     In April 2020, ZDNet reported in an article titled, "Ransomware mentioned in 1,000+ SEC filings over the past year", that "[r]ransomware gangs are now ferociously aggressive in their pursuit of big companies. They breach networks, use specialized tools to maximize damage, leak corporate information on dark web portals, and even tip journalists to generate negative news complaints as revenge against those who refuse to pay."[6]

35.     In September 2020, the United States Cybersecurity and Infrastructure Security Agency published online a "Ransomware Guide" advising that "[m]alicious actors have adjusted their ransomware tactics over time to include pressuring victims for payment by threatening to

---

[3] Mark Rosanes, *The insurance industry cyber crime report:  recent attacks on insurance businesses*, INSURANCE BUSINESS (June 12, 2023),https://www.insurancebusinessmag.com/us/guide/the-insurance-industry-cyber-crime-report-recent-attacks-on-insurance-businesses-448429.aspx.

[4] *Id.*

[5] *Id.*

[6] Catalin Cimpanu, *Ransomware mentioned in 1000 SEC filings over the past year*, ZDNET (April 30, 2020), https://www.zdnet.com/article/ransomware-mentioned-in-1000-sec-filings-over-the-past-year/.

CLASS ACTION COMPLAINT

release stolen data if they refuse to pay and publicly naming and shaming victims as secondary forms of extortion."[7]

36.    Another example is when the U.S. Department of Justice announced its seizure of AlphaBay in 2017. AlphaBay had more than 350,000 listings, many of which concerned stolen and fraudulent documents that could be used to assume another person's identity. Other marketplaces, similar to the now-defunct AlphaBay, are awash with [PII] belonging to victims from countries all over the world. One of the key challenges of protecting PII online is its pervasiveness. "As data breaches in the news continue to show, PII about employees, customers, and the public is housed in all kinds of organizations, and the increasing digital transformation of today's businesses only broadens the number of potential sources for hackers to target."[8]

37.    The PII of consumers remains of high value to criminals, as evidenced by the price they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, personal information can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[9] Experian reports that a stolen credit or debit card number can sell for $5 to $110 on the dark web.[10] Criminals can also purchase access to entire company data breaches for $900 to $4,500.[11]

38.    Social Security numbers, for example, are among the worst kinds of personal information to have stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change. The Social Security Administration stresses that the loss of an

---

[7]  Multi-State Information Sharing & Analysis Center, *Ransomware Guide*, UNITED STATES CYBERSECURITY AND INFRASTRUCTURE SECURITY AGENCY (Sept. 2020), https://www.cisa.gov/sites /default/files/2023-01/CISA_MS-ISAC_Ransomware%20Guide_S508C.pdf.

[8]  *Stolen PII & Ramifications: Identity Theft and Fraud on the Dark Web*, ARMOR (April 3, 2018), https://web.archive.org/web/20210614051146/https://www.armor.com/resources/blog/stolen-piiramificati ons-identity-theft-fraud-dark-web/.

[9]  Anita George, *Your personal data is for sale on the dark web. Here's how much it costs*, DIGITAL TRENDS (Oct. 16, 2019), https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/.

[10]  Brian Stack, *Here's How Much Your Personal Information Is Selling for on the Dark Web*, EXPERIAN (Dec. 6, 2017), https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/?msockid=2bcba6b07db36c323b77b0a17cc 26db2.

[11]  *In the Dark*, VPNOVERVIEW, https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last visited Sept. 30, 2025).

CLASS ACTION COMPLAINT

individual's Social Security number, as is the case here, can lead to identity theft and extensive

financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number assuming your identity can cause a lot of problems.[12]

39.     Moreover, it is no easy task to change or cancel a stolen Social Security number.

An individual cannot obtain a new Social Security number without significant paperwork and

evidence of actual misuse. In other words, preventative action to defend against the possibility of

misuse of a Social Security number is not permitted; an individual must show evidence of actual,

ongoing fraudulent activity to obtain a new number.

40.     Even then, a new Social Security number may not be effective. According to July

Ferguson of the Identity Theft Resource Center, "[t]he credit bureaus and banks are able to link

the new number very quickly to the old number, so all of that old bad information is quickly

inherited into the new Social Security number."[13]

41.     Because of this, the information comprised in the Data Breach here is significantly

more harmful to lose than the loss of, for example, credit card information in a retailer payment

card breach because victims can simply cancel or close credit and debit card accounts. The

information compromised in this Data Breach is impossible to "close" and difficult, if not

impossible, to change.

42.     The PII compromised by the Data Breach demands a much higher price on the black

market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "[c]ompared to

credit card information, personally identifiable information and Social Security numbers are worth

---

[12] *Identity Theft and Your Social Security Number*, SOCIAL SECURITY ADMINISTRATION, Pub. No. 05-10064 (Oct. 2024), https://www.ssa.gov/pubs/EN-05-10064.pdf.

[13] Brian Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), https://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft.

CLASS ACTION COMPLAINT

more than 10 times on the black market."[14]

43.     Once PII is sold, it is often used to gain access to various areas of the victim's digital life, including bank accounts, social media, credit cards, and tax details. This can lead to additional PII being harvested from the victim, as well as PII from family, friends, and colleagues of the original victim.

44.     According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses in 2019, resulting in more than $3.5 billion in losses to individuals and business victims.

45.     Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts.

46.     Data breaches facilitate identity theft as hackers obtain consumers' PII and thereafter use it to siphon money from current accounts, open new accounts in the names of their victims, or sell consumers' PII to others who do the same.

47.     For example, the United States Government Accountability Office noted in a June 2007 report on data breaches (the "GAO Report") that criminals use PII to open financial accounts, receive government benefits, and make purchases and secure credit in a victim's name.[15] The GAO Report further notes that this type of identity fraud is the most harmful because it may take some time for a victim to become aware of the fraud, and can adversely impact the victim's credit rating in the meantime. The GAO Report also states that identity theft victims will face, "substantial costs and inconveniences repairing damage to their credit records… [and their] good name."[16]

48.     The exposure of Plaintiffs' and Class Members' PII to cybercriminals will continue to cause substantial risk of future harm, including identity theft, that is continuing and imminent

---

[14] Tim Greene, *Anthem hack: Personal data stolen sells for 10x price of stolen credit card numbers*, NETWORK WORLD (Feb. 6, 2015), https://www.networkworld.com/article/935334/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html.

[15] *See* GOVERNMENT ACCOUNTABILITY OFFICE, *Personal Information: Data Breaches are Frequent, but Evidence of Resulting Identity Theft is Limited; However, the Full Extent is Unknown*, GAO-07-737 (June 2007), https://www.gao.gov/assets/gao-07-737.pdf.

[16] *Id.*

CLASS ACTION COMPLAINT

in light of the many different avenues of fraud and identity theft utilized by third-party cybercriminals to profit from this highly sensitive information.

### C.    California Casualty Failed to Comply with the Federal Trade Commission

49.    Federal and State governments have established security standards and issued recommendations to minimize data breaches and the resulting harm to individuals and financial institutions. The Federal Trade Commission ("FTC") has issued numerous guides for businesses that highlight the importance of reasonable data security practices. According to the FTC, data security should be factored into all business decision-making.[17]

50.    In 2016, the FTC updated its publication, "*Protecting Personal Information: A Guide for Business,"* which established guidelines for fundamental data security principles for businesses.[18] Among other things, the guidelines note that businesses should properly dispose of personal information that is no longer needed, encrypt information stored on computer networks, understand their network's vulnerabilities, and implement policies to correct security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[19]

51.    Additionally, the FTC recommends that companies limit access to sensitive data, require complex passwords for network access, use industry-tested security methods, monitor the network for suspicious activity, and verify that third-party service providers have implemented reasonable security measures.[20]

52.    Highlighting the importance of protecting against phishing and other types of data breaches, the FTC has brought enforcement actions against businesses for failing to adequately

---

[17] *See* FEDERAL TRADE COMMISSION, *Start With Security* (June 2015), https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf.

[18] *See* FEDERAL TRADE COMMISSION, *Protecting Personal Information: A Guide for Business* (Oct. 2016) www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.p
[19] *Id.*

[20] FEDERAL TRADE COMMISSION, *supra* note 17.

CLASS ACTION COMPLAINT

and reasonably protect PII, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

### D.      The Impact of Data Breach on Victims

53.      California Casualty's failure to keep Plaintiffs' and Class Members' PII secure has severe ramifications. Given the highly sensitive nature of the PII stolen in the Data Breach, Social Security numbers, first and last names, dates of birth, and medical information, hackers can commit identity theft, financial fraud, and other identity-related fraud against Plaintiffs and Class Members now and into the indefinite future. As a result, Plaintiffs have suffered injury and face an imminent and substantial risk of further injury, including identity theft and related cybercrimes, due to the Data Breach.

54.      The PII exposed in the Data Breach is highly coveted and valuable on underground markets. Identity thieves can use the PII to: (a) commit insurance fraud; (b) obtain a fraudulent driver's license or ID card in the victim's name; (c) obtain fraudulent government benefits; (d) file a fraudulent tax return using the victim's information; (e) commit medical and healthcare-related fraud; (f) access financial and investment accounts and records; (g) engage in mortgage fraud; and/or (h) commit any number of other frauds, such as obtaining a job, procuring housing, or giving false information to police during an arrest.

55.      Furthermore, malicious actors often wait months or years to use the PII obtained in data breaches, as victims often become complacent and less diligent in monitoring their accounts after a significant period has passed. These bad actors will also reuse stolen PII, meaning individuals can be victims of several cybercrimes stemming from a single data breach.

56.      Given the confirmed exfiltration of customer PII from California Casualty, many victims of the Data Breach have likely already suffered significant harm, including, but not limited to, identity theft and fraud. Plaintiffs and Class Members have also spent time, money, and effort dealing with the fallout from the Data Breach, including purchasing credit monitoring services,

11

CLASS ACTION COMPLAINT

reviewing financial and insurance statements, checking credit reports, and searching for unauthorized activity.

57.     It is no wonder, then, that identity theft exacts a severe emotional toll on its victims. The 2021 Identity Theft Resource Center survey evidences the emotional suffering experienced by victims of identity theft:

- 84% reported anxiety;

- 76% felt violated;

- 32% experienced financial-related identity problems;

- 83% reported being turned down for credit or loans;

- 32% reported problems with family members as a result of the breach;

- 10% reported feeling suicidal.[21]

58.     Identity theft can also exact a physical toll on its victims. The same survey reported that respondents experienced physical symptoms stemming from their experience with identity theft:

- 48% reported sleep disturbances;

- 37.1% reported an inability to concentrate/lack of focus;

- 28.7% reported they were unable to go to work because of physical symptoms;

- 23.1 reported new physical illnesses (aches and pains, heart palpitations, sweating, stomach issues); and

- 12.6% reported a start or relapse into unhealthy or addictive behaviors.[22]

59.     Annual monetary losses from identity theft are in the billions of dollars. According to a Presidential Report on identity theft produced in 2007:

> In addition to the losses that result when identity thieves fraudulently open accounts . . . individual victims often suffer indirect financial costs, including the costs incurred in both civil litigation initiated by creditors and in overcoming the many obstacles they face in obtaining or retaining credit. Victims of non-financial identity

---

[21] IDENTITY THEFT RESOURCE CENTER, *2021 Consumer Aftermath Report:  How Identity Crimes Impact Victims, their Families, Friends, and Workplaces* (2021), https://www.idtheftcenter.org/wp-content/uploads/2021/09/ITRC_2021_Consumer_Aftermath_Report.pdf.

[22] *Id.*

CLASS ACTION COMPLAINT

theft, for example, health-related or criminal record fraud, face other types of harm and frustration.

In addition to out-of-pocket expenses that can reach thousands of dollars for the victims of new account identity theft, and the emotional toll identity theft can take, some victims have to spend what can be a considerable amount of time to repair the damage caused by the identity thieves. Victims of new account identity theft, for example, must correct fraudulent information in their credit reports and monitor their reports for future inaccuracies, close existing bank accounts and open new ones, and dispute charges with individual creditors.

60. The unauthorized disclosure of sensitive PII to data thieves also reduces its inherent value to its owner, which has been recognized by courts as an independent form of harm.[23]

61. Consumers are injured every time their data is stolen and traded on underground markets, even if they have been victims of previous data breaches. Indeed, the dark web comprises multiple discrete repositories of stolen information that can be aggregated together or accessed by different criminal actors who intend to use it for different fraudulent purposes. Each data breach increases the likelihood that a victim's personal information will be exposed to more individuals who are seeking to misuse it at the victim's expense.

62. As a result of the wide variety of injuries that can be traced to the Data Breach, Plaintiffs and Class Members have and will continue to suffer economic loss and other actual harm for which they are entitled to damages, including, but not limited to, the following:

a. The unconsented disclosure of confidential information to a third party;

b. Unauthorized use of their PII without compensation;

c. Losing the value of the explicit and implicit promises of data security;

d. Losing the value of access to their PII permitted by California Casualty without their permission;

e. Identity theft and fraud resulting from the theft of their PII;

f. Costs associated with the detection and prevention of identity theft and unauthorized use of their financial accounts;

---

[23] *See In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 440 F. Supp. 3d 447, 462 (D. Md. 2020) ("Neither should the Court ignore what common sense compels it to acknowledge—that the value that personal identifying information has in our increasingly digital economy. Many companies, like Marriott, collect personal information. Consumers too recognize the value of their personal information and offer it in exchange for goods and services.").

CLASS ACTION COMPLAINT

g.      Anxiety, emotional distress, and loss of privacy;

h.      The present value of ongoing credit monitoring and identity theft protection services necessitated by the Data Breach;

i.      Unauthorized charges and loss of use of and access to their accounts;

j.      Lowered credit scores resulting from credit inquiries following fraudulent activities;

k.      Costs associated with time spent and the loss of productivity or the enjoyment of one's life from taking time to address and attempt to mitigate and address the actual and future consequences of the Data Breach, including searching for fraudulent activity, imposing withdrawal and purchase limits on compromised accounts, and the stress, nuisance, and annoyance of dealing with the repercussions of the Data Breach; and

l.      The continued, imminent, and certainly impending injury flowing from potential fraud and identity theft posed by their PII being in the possession of one or more unauthorized third parties.

63.      Even in instances where an individual is reimbursed for a financial loss due to identity theft or fraud, that does not make that individual whole again as there is typically significant time and effort associated with seeking reimbursement. The Department of Justice's Bureau of Justice Statistics found that identity theft victims, "reported spending an average of about 7 hours clearing up the issues" relating to identity theft or fraud.[24]

64.      Plaintiffs and Class Members place significant value on data security. According to a survey conducted by cyber-security company FireEye Mandiant, approximately 50% of consumers consider data security to be a main or important consideration when making purchasing decisions and nearly the same percentage would be willing to pay more to work with a provider that has better data security. Seventy percent of consumers would be less willing to provide personal information to organizations that have suffered a data breach.[25]

65.      Plaintiffs and Class Members have a direct interest in California Casualty's promises and duties to protect PII, *i.e.*, that California Casualty would ***not increase*** their risk of identity theft and fraud. Because California Casualty failed to live up to its promises and duties in

---

[24] E. Harrell, *Victims of Identity Theft, 2014*, U.S. DEPARTMENT OF JUSTICE (Nov. 13, 2017), http://www.bjs.gov/content/pub/pdf/vit14.pdf.

[25] Richard Turner, *Beyond the Bottom Line:  The Real Cost of Data Breaches*, FIREEYE (May 11, 2016), https://web.archive.org/web/20210422161745/https://www.fireeye.com/blog/executive-perspective/2016/05/beyond_the_bottomli.html.

CLASS ACTION COMPLAINT

this respect, Plaintiffs and Class Members seek the present value of ongoing identity protection services to compensate them for the present harm and present and continuing increased risk of harm caused by California Casualty's wrongful conduct. Through this remedy, Plaintiffs seek to restore themselves and Class Members as close to the same position as they would have occupied but for California Casualty's wrongful conduct, namely its failure to adequately protect Plaintiffs' and the Class Members' PII.

66.    Plaintiffs and Class Members further seek to recover the value of the unauthorized access to their PII permitted through California Casualty's wrongful conduct. This measure of damages is analogous to the remedies for the unauthorized use of intellectual property. Like a technology covered by a trade secret or patent, use or access to a person's PII is non-rivalrous—the unauthorized use by. Another does not diminish the rights-holder's ability to practice the patented invention or use the trade-secret protected technology. Nevertheless, a Plaintiffs may generally recover the reasonable use of the value of the IP—*i.e.*, a "reasonable royalty" from an infringer. This is true even though the infringer's use did not interfere with the owner's own use (as in the case of a non-practicing patentee) and even though the owner would not have otherwise licensed such IP to the infringer. A similar royalty or license measure of damages is appropriate here under common law damages principles, authorizing recovery of rental or use value. This measure is appropriate because: (a) Plaintiffs and Class Members have a protectible property interest in their PII; (b) the minimum damages measure for the unauthorized use of personal property is its rental value; (c) rental value is established with reference to market value, i.e., evidence regarding the value of similar transactions.

67.    Plaintiffs and Class Members have an interest in ensuring that their PII is secured and not subject to further theft, as California Casualty continues to hold their PII.

## CLASS ACTION ALLEGATIONS

68.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action on behalf of themselves and the following proposed Nationwide Class (herein "the Class"), defined as follows:

CLASS ACTION COMPLAINT

**Nationwide Class**

All persons residing in the United States whose personally identifiable information was compromised in the Data Breach experienced by California Casualty in September 2025, including all who were sent a notice of the Data Breach.

**California Subclass**

All persons residing in California whose personally identifiable information was compromised in the Data Breach experienced by California Casualty in September 2025, including all who were sent a notice of the Data Breach.

69. Excluded from the proposed Nationwide Class, the California Subclass is any officer or director of California Casualty; any officer or director of any affiliate, parent, or subsidiary of California Casualty; anyone employed by counsel in this action; and any judge to whom this case is assigned, his or her spouse, and members of the judge's staff.

70. **Numerosity:** the proposed Nationwide Class and the California Subclass are likely to number in the tens of thousands and are thus too numerous to practically join in a single action. Membership in the Class is readily ascertainable from California Casualty's own records.

71. **Commonality:** Common questions of law and fact exist as to the proposed Nationwide Class and the California Subclass and predominate over questions affecting only individual Class Members. These common questions include:

a. Whether California Casualty engaged in the wrongful conduct alleged herein;

b. Whether California Casualty's inadequate data security measures were a cause of the Data Breach;

c. Whether California Casualty owed a legal duty to Plaintiffs and the other Class Members to exercise due care in collecting, storing, and safeguarding their PII;

d. Whether California Casualty negligently or recklessly breached legal duties owed to Plaintiffs and the Class Members to exercise due care in collecting, storing, and safeguarding their PII;

e. Whether Plaintiffs and the proposed Nationwide Class and the California Subclass are at an increased risk for identity theft because of the Data Breach;

f. Whether California Casualty failed to implement and maintain reasonable security procedures and practices for Plaintiffs' and Class Members' PII;

g. Whether Plaintiffs and the other Class Members are entitled to equitable relief, including, but not limited to, injunctive relief and restitution.

72. California Casualty engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiffs, individually, and on behalf of the other Class Members.

16

CLASS ACTION COMPLAINT

Similar or identical statutory and common violations, business practices, and injuries are involved. Individual questions, if any, pale in comparison, both in quantity and quality, to the numerous questions that dominate this action.

73.    **Typicality:** Plaintiffs' claims are typical of the claims of the Members of the proposed Nationwide Class and the California Subclass. All Class Members were subject to the Data Breach and had their PII accessed by and/or disclosed to unauthorized third parties. California Casualty's misconduct affected all Class Members in the same manner.

74.    **Adequacy of Representation:** Plaintiffs are adequate representatives of the proposed Nationwide Class and the California Subclass because their interests do not conflict with the interests of the other Class Members they seek to represent; they have retained counsel competent and experienced in complex class action litigation, and Plaintiffs will prosecute this action vigorously. The interests of the proposed Nationwide Class and the California Subclass will be fairly and adequately protected by Plaintiffs and their counsel.

75.    **Superiority:** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this matter as a class action. The damages, harm, or other financial detriment suffered individually by Plaintiffs and the other Class Members are relatively small compared to the burden and expense that would be required to litigate their claims on an individual basis against California Casualty, making it impracticable for Class Members to individually seek redress for California Casualty's wrongful conduct. Even if Class Members could afford individual litigation, the court system could not. Individualized litigation would create a potential for inconsistent or contradictory judgments, increasing the delay and expense for all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

/ / /

/ / /

/ / /

CLASS ACTION COMPLAINT

**CAUSES OF ACTION**

**COUNT I**
**NEGLIGENCE**
**(On Behalf of Plaintiffs and the Nationwide Class Against Defendant)**

76.     Plaintiffs reallege paragraphs 1 through 75 as if fully set forth herein.

77.     Plaintiffs bring this claim individually and on behalf of the Class.

78.     California Casualty owed a duty to Plaintiffs and the Class to exercise reasonable care in obtaining, securing, safeguarding, storing, and protecting Plaintiffs' and Class Members' PII from being compromised, lost, stolen, and accessed by unauthorized persons. This duty includes, among other things, designing, maintaining, and testing its data security systems to ensure that Plaintiffs' and Class Members' PII in California Casualty's possession was adequately secured and protected.

79.     California Casualty owed, and continues to owe, a duty to Plaintiffs and the other Class Members to safeguard and protect their PII.

80.     California Casualty breached its duty by failing to exercise reasonable care and failing to safeguard and protect Plaintiffs' and the other Class Members' PII.

81.     It was reasonably foreseeable that California Casualty's failure to exercise reasonable care in safeguarding and protecting Plaintiffs' and the other Class Members' PII would result in an unauthorized third-party gaining access to such information for no lawful purpose.

82.     As a direct result of California Casualty's breach of its duty of confidentiality and privacy and the disclosure of Plaintiffs' and the member of the Class's confidential information, Plaintiffs and the members of the Class suffered damages, including, without limitation, loss of the benefit of the bargain, exposure to heightened future risk of identity theft, increased infiltrations into their privacy through spam and/or attempted identity theft, loss of privacy, loss of confidentiality, embarrassment, emotional distress, humiliation and loss of enjoyment of life.

83.     By engaging in the negligent acts and omissions alleged herein, which permitted an unknown third party to access California Casualty's systems containing the PII at issue, California Casualty failed to meet the data security standards set forth under Section 5 of the FTC Act, which prohibits "unfair . . . practices in or affecting commerce." This prohibition includes failing to have

1  adequate data security measures, which California Casualty has failed to do as discussed herein.

2      84.    California Casualty's failure to meet this standard of data security established under

3  Section 5 of the FTC Act is evidence of negligence.

4      85.    Neither Plaintiffs nor other Class Members contributed to the Data Breach as

5  described in this Complaint.

6      86.    California Casualty's wrongful actions and/or inaction and the resulting Data

7  Breach (as described above) constituted (and continue to constitute) negligence at common law.

8      87.    As a result of California Casualty's above-described wrongful actions, inaction, and

9  want of ordinary care that directly and proximately caused the Data Breach, Plaintiffs and Class

10  Members have suffered and will suffer injury, including, but not limited to: (i) a substantially

11  increased and imminent risk of identity theft; (ii) the compromise, publication, and theft of their

12  PII; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from

13  unauthorized use of their PII; (iv) lost opportunity costs associated with efforts attempting to

14  mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII

15  which remains in California Casualty's possession; (vi) future costs in terms of time, effort, and

16  money that will be required to prevent, detect, and repair the impact of the PII compromised as a

17  result of the Data Breach; and (vii) overpayment for the services that were received without

18  adequate data security.

19                          **COUNT II**
                       **NEGLIGENCE *PER SE***
20            **(On Behalf of Plaintiffs and the Nationwide Class)**

21      88.    Plaintiffs reallege paragraphs 1 through 75 as if fully set forth herein.

22      89.    Plaintiffs bring this claim individually and on behalf of the Class.

23      90.    Pursuant to the Federal Trade Commission Act (15 U.S.C. § 45), Defendant had a

24  duty to provide fair and adequate computer systems and data security practices to safeguard

25  Plaintiff's and Class Members' Personal Information.

26      91.    Pursuant to Cal. Civ. Code § 56 et seq., Defendant had a duty to implement and

27  maintain reasonable security procedures and practices to safeguard Plaintiffs' and Class Members'

28  Personal Information.

CLASS ACTION COMPLAINT

92.     Defendant breached its duties to Plaintiffs and Class Members under the Federal Trade Commission Act (15 U.S.C. § 45) and Cal. Civ. Code § 56 *et seq.* by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiffs' and Class Members' Personal Information.

93.     Defendant's failure to comply with applicable laws and regulations constitutes negligence *per se*.

94.     But for Defendant's wrongful and negligent breach of its duties owed to Plaintiffs and Class Members, Plaintiffs and Class Members would not have been injured.

95.     The injury and harm suffered by Plaintiffs and Class Members were the reasonably foreseeable result of Defendant's breach of its duties. Defendant knew or should have known that it was failing to meet its duties, and that Defendant's breach would cause Plaintiffs and Class Members to experience the foreseeable harms associated with the exposure of their Personal Information.

96.     As a direct and proximate result of Defendant's negligent conduct, Plaintiffs and Class Members now face an increased risk of future harm.

97.     As a direct and proximate result of Defendant's negligent conduct, Plaintiffs and Class Members have suffered injury and are entitled to damages in an amount to be proven at trial.

**COUNT III**
**BREACH OF CONTRACT**
**(On Behalf of Plaintiffs and the Nationwide Class)**

98.     Plaintiffs reallege paragraphs 1 through 75 as if fully set forth herein.

99.     Plaintiffs bring this claim individually and on behalf of the Nationwide Class.

100.     Plaintiffs and Class Members entered into a valid and enforceable contract through which they were required to turn over their sensitive personal information to Defendant in exchange for Defendant's services.

101.     That contract included promises by Defendant to secure, safeguard, and not disclose Plaintiffs' and Class Members' sensitive personal information to any third parties without their consent.

102.     Pursuant to these contracts, the Plaintiffs and Nationwide Class paid money to

20

California Casualty and provided California Casualty with their Private Information. In exchange, California Casualty agreed to, among other things: (1) provide insurance services relating to Plaintiffs and Nationwide Class; (2) use Plaintiffs' and Nationwide Class's Private Information to facilitate providing insurance services involving Plaintiffs and Nationwide Class; (3) take reasonable measures to protect the security and confidentiality of Plaintiffs' and Nationwide Class's Private Information; and (4) protect Plaintiffs' and Nationwide Class's Private Information in compliance with federal and state laws and regulations, industry standards, and California Casualty's representations regarding its security and privacy practices.

103.    The protection of Private Information was a material term of the contracts between Plaintiffs and California Casualty. Had Plaintiffs and Nationwide Class known that California Casualty would not adequately protect their Private Information, they would not have paid for or obtained insurance services from California Casualty.

104.    California Casualty breached its obligations under the contracts with Plaintiffs and the Nationwide Class in failing to implement and maintain reasonable security measures to protect and secure Plaintiffs' and Nationwide Class's Private Information, and in failing to implement and maintain security protocols and procedures to protect Plaintiffs' and Nationwide Class's Private Information in a manner that complies with applicable laws, regulations, and industry standards.

105.    California Casualty's breach of its obligations with Plaintiffs and Nationwide Class directly resulted in the Data Breach and the resulting injuries to Plaintiffs and Nationwide Class.

106.    Plaintiffs and Nationwide Class were damaged by California Casualty's breach of contract because: (i) they now face a substantially increased and imminent risk of identity theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (ii) their Private Information was improperly disclosed to unauthorized individuals; (iii) the confidentiality of their Private Information has been breached; (v) they were deprived of the value of their Private Information, for which there is a well-established national and international market; and (v) they lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of identity theft they face and will continue to face.

CLASS ACTION COMPLAINT

**COUNT IV**
**BREACH OF IMPLIED CONTRACT**
**(On Behalf of Plaintiffs and the Nationwide Class)**

107.    Plaintiffs reallege paragraphs 1 through 75 as if fully set forth herein.

108.    Through their course of conduct, Defendant, Plaintiffs, and Class Members entered into implied contracts for Defendant to implement data security adequate to safeguard and protect the privacy of Plaintiffs' and Class Members' Private Information.

109.    Defendant solicited, invited, and required Plaintiffs and Class Members to provide their Private Information as part of Defendant's regular business practices. Plaintiffs and Class Members accepted Defendant's offers and provided their Private Information to Defendant.

110.    As a condition of being direct customers and/or employees of Defendant, Plaintiffs and Class Members provided and entrusted their Private Information to Defendant. In so doing, Plaintiffs and Class Members entered into implied contracts with Defendant by which Defendant agreed to safeguard and protect such non-public information, to keep such information secure and confidential, and to timely and accurately notify Plaintiffs and Class Members if their data had been breached, compromised, or stolen.

111.    A meeting of the minds occurred when Plaintiffs and Class Members agreed to, and did, provide their Private Information to Defendant in exchange for, among other things, the protection of their Private Information.

112.    Plaintiffs and Class Members fully performed their obligations under the implied contracts with Defendant.

113.    Defendant breached the implied contracts it made with Plaintiffs and Class Members by failing to safeguard and protect their Private Information and by failing to provide timely and accurate notice that their Private Information was compromised as a result of the Data Breach.

114.    As a direct and proximate result of Defendant's above-described breach of implied contract, Plaintiffs and Class Members have suffered and will continue to suffer (i) ongoing, imminent, and impending threat of identity theft, fraud, and abuse resulting in monetary loss and economic harm; (ii) actual identity theft, fraud, and abuse resulting in monetary loss and economic

CLASS ACTION COMPLAINT

harm; (iii) loss of the confidentiality of the stolen confidential data; (iv) the illegal sale of the compromised data on the dark web; (v) lost work time; and (vi) other economic and noneconomic harm.

**COUNT V**
**CALIFORNIA UNFAIR COMPETITION LAW**
**Cal. Bus. & Prof. Code §§ 17200, *et seq.***
**(On Behalf of Plaintiff Ramos and the California Subclass)**

115.    Plaintiff Ramos realleges paragraphs 1 through 75 as if fully set forth herein. All references in this cause of action to "Class Members" refers to the California Subclass.

116.    Defendant is a "person" as defined by Cal. Bus. & Prof. Code § 17201.

117.    Defendant violated Cal. Bus. & Prof. Code § 17200, et seq. ("UCL") by engaging in unlawful, unfair, and deceptive business acts and practices.

118.    Defendant's "unfair" acts and practices include:

a.    Failing to maintain reasonable data-security measures to protect Plaintiff Ramos's and Class Members' Private Information from unauthorized access, which directly caused the Data Breach and resulting harm;

b.    Failing to use safeguards consistent with public policy requiring businesses to protect consumers' data, including policies embodied in the Federal Trade Commission Act, 15 U.S.C. § 45, *et seq.*;

c.    Causing substantial consumer injury through inadequate security practices that provided no offsetting benefit to consumers or competition and could not reasonably have been avoided; and

d.    Violating Cal. Civ. Code § 1798.82 by failing to provide timely and adequate breach notification.

119.    Defendant has also engaged in "unlawful" business practices by violating multiple laws, including California's Consumer Records Act, Cal. Civ. Code §§ 1798.81.5 (requiring reasonable data security measures) and 1798.82 (requiring timely breach notification), California's Consumers Legal Remedies Act, Cal. Civ. Code § 1780, *et seq.*, the FTC Act, 15 U.S.C. § 45, *et seq.*, and California common law.

120.    Defendant's unlawful, unfair, and deceptive acts and practices include:

a.    Failing to establish and enforce adequate data security and privacy safeguards to protect Plaintiff Ramos's and Class Members' Private Information, which directly and proximately caused the Data Breach;

b.    Neglecting to anticipate and address foreseeable cybersecurity threats,

23

correct known vulnerabilities, and maintain or strengthen protective measures, thereby directly contributing to the Data Breach;

     c.    Disregarding duties imposed by common law and statute—including those set forth under the FTC Act, 15 U.S.C. § 45, *et seq.*—to properly secure and preserve the confidentiality of Plaintiff Ramos's and Class Members' Private Information;

     d.    Misrepresenting that Defendant had implemented appropriate practices to ensure the privacy and confidentiality of Plaintiff Ramos's and Class Members' Private Information;

     e.    Misrepresenting compliance with applicable legal and regulatory obligations concerning data security and privacy, including those established under the FTC Act, 15 U.S.C. § 45, *et seq.*;

     f.    Concealing and failing to disclose the material fact that Defendant did not maintain adequate or reasonable data-security systems to protect Plaintiff's and Class Members' Private Information; and

     g.    Concealing and failing the material fact that Defendant failed to adhere to its common law and statutory duties relating to the protection and privacy of Plaintiff Ramos's and Class Members' Private Information, including obligations imposed by the FTC Act, 15 U.S.C. § 45, *et seq.*

121.    Defendant's representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of Defendant's data security and its ability to protect the confidentiality of consumers' Private Information.

122.    As a direct and proximate result of Defendant's unfair, unlawful, and fraudulent acts and practices, Plaintiff Ramos and Class Members were injured and lost money or property, including: (i) the price paid to Defendant for goods and services; (ii) monetary damages from fraud and identity theft; (iii) time and expenses incurred monitoring financial accounts for fraudulent activity; (iv) an increased and imminent risk of fraud and identity theft; and (v) loss of the value of their Private Information.

123.    Defendant acted intentionally, knowingly, and maliciously to violate California's Unfair Competition Law and recklessly disregarded Plaintiff Ramos's and Class Members' rights.

124.    Plaintiff Ramos and Class Members seek all monetary and nonmonetary relief allowed by law, including restitution of all profits obtained through Defendant's unfair, unlawful, and fraudulent business practices or use of their Private Information, declaratory relief, reasonable attorneys' fees and costs under California Code of Civil Procedure § 1021.5, injunctive relief, and all other appropriate equitable relief.

**COUNT VI**
**VIOLATION OF THE CALIFORNIA**
**CONSUMER PRIVACY ACT ("CCPA")**
**(On Behalf of Plaintiff Ramos and the California Subclass)**

125.    Plaintiff Ramos realleges paragraphs 1 through 75 as if fully set forth herein. All references in this cause of action to "Class Members" refers to the California Subclass.

126.    At all relevant times, each defendant was a "business" as defined in Cal. Civ. Code § 1798.140(c), and Plaintiff Ramos and the California Subclass Members were "consumers" as defined in Cal. Civ. Code § 1798.140(g).

127.    The PII collected and stored by California Casualty constitutes "personal information" as defined in Cal. Civ. Code. Sec. 1798.81.5, including but not limited to names and driver's license numbers.

128.    The CCPA, Cal. Civ. Code § 1798.150(a) provides a private right of action for any consumer whose nonencrypted or nonredacted personal information is subject to unauthorized access, exfiltration, theft, or disclosure as a result of a business's violation of its duty to implement and maintain reasonable security procedures and practices.

129.    California Casualty failed to implement and maintain reasonable security practices and procedures appropriate for protecting personal information from unauthorized access, exfiltration, and disclosure, in violation of Cal. Civ. Code § 1798.150(a).

130.    As a direct and proximate result of California Casualty's violations of the CCPA, the personal information of Plaintiff Ramos and the California Subclass Members was compromised in the Data Breach.

131.    Concurrently with the filing of this complaint, Plaintiff Ramos is serving California Casualty with the notice required by Cal. Civ. Code § 1798.150(b) and will amend this complaint to allege a claim for statutory damages when the 30-day notice period expires. Presently, Plaintiff Ramos seeks injunctive relief to ensure California Casualty implements and maintains reasonable security procedures to protect the private information of the California Subclass Members.

1
2
3

**COUNT VII**
**VIOLATION OF THE CALIFORNIA**
**CONSUMER RECORDS ACT**
**(Cal. Civ. Code. Sec. 1798.80, *et seq.*)**
**(on behalf of Plaintiff Ramos and the California Subclass)**

4    132.    Plaintiff Ramos realleges paragraphs 1 through 75 as if fully set forth herein. All

5    references in this cause of action to "Class Members" refers to the California Subclass.

6    133.    At all relevant times, each defendant was a "business" that owns or licenses

7    computerized data that includes personal information, as defined by Cal. Civ. Code §

8    1798.81.5(d)(1). The Private Information at issue here includes "personal information" as defined

9    in Cal. Civ. Code § 1798.80(e).

10    134.    The California Customer Records Act ("CRA") requires businesses to implement

11    and maintain reasonable security procedures and practices appropriate to the nature of the

12    information to protect it from unauthorized access, destruction, use, modification, or disclosure.

13    Cal. Civ. Code § 1798.81.5(b).

14    135.    California Casualty failed to implement and maintain such reasonable security

15    procedures and practices. As a result of California Casualty's violation of § 1798.81.5, Plaintiff

16    Ramos's and the California Subclass Members' personal information was stolen by

17    cybercriminals/hackers.

18    136.    The CRA requires that any business that maintains personal information subject to

19    a security breach must disclose the breach as soon as possible and without unreasonable delay.

20    Cal. Civ. Code § 1798.82(a). California Casualty failed to disclose the Data Breach to Plaintiff

21    Ramos and the California Subclass Members without unreasonable delay, waiting months after

22    discovery of the Data Breach to begin notifying impacted individuals.

23    137.    As a direct and proximate result of California Casualty's violations of the CRA,

24    Plaintiff Ramos and the California Subclass Members have suffered damages as alleged herein

25    and seek all remedies available under Cal. Civ. Code §§ 1798.84(b), including compensatory

26    damages, injunctive relief, and attorneys' fees and costs.

27
28

CLASS ACTION COMPLAINT

## COUNT VIII
## UNJUST ENRICHMENT
### (On Behalf of Plaintiffs and the Nationwide Class)

138.    Plaintiffs reallege paragraphs 1 through 75 as if fully set forth herein.

139.    Plaintiffs and Class Members conferred a monetary benefit upon California Casualty in the form of payments for insurance or related services, with an implicit understanding that California Casualty would use some of these payments to protect the PII they collect, store, and use to process insurance.

140.    California Casualty accepted or had knowledge of the benefits conferred upon it by Plaintiffs and Class Members. California Casualty also benefited from the receipt of Plaintiffs' and Class Members' PII, as this was used to facilitate insurance services and other aspects of California Casualty's business.

141.    As a result of California Casualty's conduct, Plaintiffs and Class Members suffered actual damages in an amount equal to the difference in value between its payments made with reasonable data privacy and security practices and procedures that Plaintiffs and Class Members paid for, and those payments without reasonable data privacy and security practices and procedures that they received.

142.    California Casualty should not be permitted to retain the money belonging to Plaintiffs and the Class Members because California Casualty failed to adequately implement the data privacy and security procedures that Plaintiffs and Class members paid for and that were otherwise mandated by federal, state, and local laws and industry standards.

143.    California Casualty should be compelled to provide for the benefit of Plaintiffs and Class Members all unlawful proceeds received by them as a result of the conduct and Data Breach alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the other members of the Nationwide Class and the California Subclass proposed in this Petition, respectfully request that the Court enter judgment in their favor and against California Casualty, as follows:

a.   Declaring that this action is a proper class action, certifying the Nationwide Class and the

CLASS ACTION COMPLAINT

California Subclass as requested herein, designating Plaintiffs as Class Representative, and appointing Plaintiffs' counsel as Lead Counsel for the Nationwide Class and the California Subclass;

b.  Awarding Plaintiffs and the Nationwide Class and the California Subclass appropriate monetary relief, including actual damages, statutory damages, punitive damages, restitution, and disgorgement;

c.  Awarding Plaintiffs and the Class equitable, injunctive, and declaratory relief, as may be appropriate. Plaintiffs, on behalf of himself and the Nationwide Class and the California Subclass, seeks appropriate injunctive relief designed to prevent California Casualty from experiencing another data breach by adopting and implementing best data security practices to safeguard PII and to provide or extend credit monitoring services and similar services to protect against all types of identity theft and medical identity theft;

d.  Awarding Plaintiffs and the Nationwide Class and the California Subclass pre-judgment and post-judgment interest to the maximum extent allowable;

e.  Awarding Plaintiffs and the Nationwide Class and the California Subclass reasonable attorneys' fees, costs, and expenses, as allowable; and

f.  Awarding Plaintiffs and the Nationwide Class and the California Subclass, such other favorable relief as allowable under law.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all appropriate issues raised in this Class Action Complaint.

Dated: December 19, 2025

Respectfully submitted,

By: */s/Trenton R. Kashima*
Trenton R. Kashima (SBN 291405)
**BRYSON HARRIS SUCIU**
**& DeMAY PLLC**
19800 MacArthur Blvd., Suite 270
Irvine, CA 92612
Telephone: (212) 946-9389
tkashima@brysonpllc.com

J. Hunter Bryson  (*pro hac vice* forthcoming)
**BRYSON HARRIS SUCIU**
**& DeMAY PLLC**
900 West Morgan Street
Raleigh, North Carolina 27603
Telephone: (919) 539-2708
hbryson@brysonpllc.com

*Counsel for Plaintiffs and the Class*